IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **SUNILKUMAR K. PATEL,** *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | Civil No.: ELH-14-1709 |
| | : | |
| **UNITED STATES** | : | |
| **DEPARTMENT OF AGRICULTURE,**[1] | : | |
| | : | |
| **Defendant.** | : | |

...oOo...

# MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
# OR FOR SUMMARY JUDGMENT

The Greensboro Deli and its owners have been properly disqualified from the Supplemental Nutrition Assistance Program ("SNAP"). The mission of SNAP is "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households." *See* 7 U.S.C. §§ 2011-2036a. SNAP is administered by the United States Department of Agriculture ("USDA") through the Food and Nutrition Service ("FNS"). One instance of trafficking in SNAP benefits is sufficient for disqualification.

Until its disqualification, Greensboro Deli customers could buy SNAP-eligible food items with Electronic Benefit Transfer ("EBT") cards that allowed transfer of SNAP benefits, i.e. payments from the federal government, to the store. After a visit to Greensboro Deli revealed a limited stock of SNAP eligible items for sale, and after an analysis of EBT data revealed numerous, repetitive, large transactions atypical for a small convenience store with limited stock, FNS charged Greensboro with trafficking in SNAP benefits. Greensboro has not provided an

---

[1] The United States is the proper party defendant in a suit challenging disqualification from the Supplemental Nutrition Assistance Program. 7 U.S.C. § 2023(a)(13).

evidence-based, cogent explanation for the size, volume, and repetitiveness of transactions at a store with such a modest inventory – particularly when a full-service supermarket that takes SNAP benefits is less than two-tenths of a mile away. Because Greensboro Deli has been and will be unable to meet its burden to prove that trafficking did not occur, this Court should grant summary judgment to the United States.

## FACTS AND PROCEDURAL HISTORY

Greensboro Deli filed a SNAP Application for Stores in October 2010. A.R. 1-10.[2] The application reflects that the store carried "at least three different items" in each of three categories: Bread/Grains; Dairy; Fruits/Vegetables; and Meat/Poultry/Fish. A.R. 6. A note appended to the electronic application indicates that one of the owners stated the store stocked "a variety of produce." A.R. 7. The application indicated that 50% of retail sales came from SNAP-ineligible hot foods and non-foods such as tobacco products and alcohol. A.R. 6-7.

**I.  FNS inspected Greensboro Deli and found limited stock of SNAP-eligible items and many ineligible items.**

FNS inspected Greensboro Deli in August 2013. A.R. 11-46. Store owner Sunil Patel gave consent for FNS to review the store, including to take photographs, sketch the layout, and collect information related to the store's participation in SNAP. A.R. 15.

A sign outside the store announced that the store was "ACCEPTING EBT CARDS." A.R. 35. The inside size of the store was estimated at 1000 square feet, with a large amount of space dedicated to in-store food preparation and consumption. A.R. 12, 16, 20, 42. The store had one cash register, one point-of-sale device for EBT purchases, and a lottery terminal. A.R. 11, 29, 34. There was no optical scanner, shopping baskets, or shopping carts. A.R. 11.

The store offered non-food stock, like tobacco products (A.R. 36), alcohol (A.R. 43),

---

[2] "A.R." refers to the certified Administrative Record that has been filed with the Court and served on opposing counsel.

lottery tickets (A.R. 34), auto supplies, paper products, cleaning supplies, and health and beauty items (A.R. 33). *See* A.R. 12. The signage surrounding the entrance to the store showed prices and pack-sizes for various brands of beer, including Budweiser, BudLite, Miller Lite, Heneiken, Modelo, and Corona. A.R. 35. Most of these brands (and others) were available inside the store. A.R. 43.

The store sold hot food for on-site consumption. A.R. 11. Menus for hot breakfast items and sandwiches, including hot sandwiches, were prominently displayed. A.R. 25, 28. There was no food stored in a storage area out of public view. A.R. 12.

The inspector inventoried SNAP-eligible foods. A.R. 13. Although many were stocked in limited quantities, SNAP-eligible food items like milk, bread, juices, chips and other snacks, sodas, cereal, canned goods, ice cream, and candy were sold in the store. *See* A.R. 17-19, 21-24, 26-27, 30-32, 37-40, 44-46. Out of twelve categories of vegetables, the inspector found four in the store. A.R. 13. Out of ten categories of meats, poultry, and fish, the inspector found only one: two cartons of eggs. A.R. 13, 18. The store did not sell Meat/Seafood Specials or Bundles, or Fruit/Vegetable Boxes. A.R. 11.

## II.     FNS compiled and analyzed suspicious data from EBT Transactions.

Subsequently, Greensboro Deli appeared on the FNS' EBT ALERT System as having met patterns consistent with possible EBT trafficking violations. A.R. 47. FNS therefore selected and analyzed EBT SNAP transaction data from Greensboro Deli for October, November, and December 2013. *Id*.

The data showing repetitive transactions made in a short period of time from the same households. A.R. 49. FNS found thirteen sets of transactions where multiple withdrawals were made from the account of a SNAP household within a 24 hour period. *Id*.; A.R. 56-57. The transaction data show, for example, that one household made a purchase of $242.06 using a

3

SNAP EBT card and then two minutes later made another purchase of $31.55 using SNAP benefits from the same account. A.R. 56. There are several other instances of transactions within minutes of each other for total amounts of $138.50, $190.38, and $193.30, respectively. *Id*. One household redeemed SNAP benefits using an EBT for $110.53 at around 11:00 a.m., then redeemed $25.62 worth of benefits less than four minutes later, then redeemed $41.33 worth of benefits later that afternoon, and then redeemed $35.05 worth of benefits at 10:00 a.m. the next morning. A.R. 57 (Transactions 19-22).

FNS also selected and analyzed excessively large purchase transactions as compared to the average Maryland convenience store purchase transaction for the same time period. A.R. 49, 51, 58-60. The total SNAP transaction amount for the average Maryland convenience store was a little over $11,000, with an average transaction count of 1,384 and an average transaction amount of $8.18. A.R. 51. The total SNAP transaction amount for Greensboro Deli was $17,891.45, with a transaction count of 871 and an average transaction amount of $20.54. A.R. 51. Of the $17,891.45 in total transactions, $10,174.84 of that total occurred in just 137 transactions. A.R. 60. Out of the 137 transactions, 68 of them were for $50.00 or more, 33 of them were for $100 or more, and 12 of them were for over $150.

## III. FNS charged Greensboro Deli with trafficking SNAP benefits based on a store inspection and analysis of EBT data.

In January 2014, FNS by letter charged Greensboro Deli with trafficking SNAP benefits during the months of October 2013 – December 2013. A.R. 53-55. Two categories of evidence were identified: multiple transactions made from individual benefit accounts in unusually short time frames, and excessively large purchase transactions made from recipient accounts. A.R. 53. Greensboro Deli was informed that "[i]f it is determined that your firm committed the trafficking violations noted above, it will be permanently disqualified" from SNAP. *Id*. FNS informed

4

Greensboro Deli that it would fully consider any reply or documentation before making a final decision. A copy of the relevant EBT data was included with the letter. A.R. 53, 56-60.

## IV. Plaintiffs responded to the charge letter.

Counsel for Greensboro Deli responded to the charge letter on the last day of January 2014. A.R. 63-105. Greensboro Deli denied ever committing a trafficking offense and asserted that it abided by procedures set forth in the "SNAP Training Guide for Retailers." A.R. 63. It also offered explanations for the trafficking charges made by FNS. A.R. 65-69.

As to multiple transactions made from individual benefit accounts in unusually short time frames, Greensboro Deli asserted that customers used multiple transactions to assess their SNAP account balance. A.R. 65. Greensboro Deli also asserted that customers performed separate transactions for food that would be prepared and eaten at home, and as distinct from other items "such as soft drinks, candies, cookies, snack crackers, ice cream, and ready to eat items, such as cold deli sandwiches and salads." A.R. 65-66. The response letter further asserted that many customers are local and go to the store multiple times in a given day, or simply forget "something" they meant to purchase, or see "something" they needed immediately after their first transaction. A.R. 66. Greensboro Deli also pointed to non-SNAP customers who also made multiple purchases in short time periods with credit cards. *Id*.; A.R. 81-84.

With respect to an excessive number of large purchase transactions, Greensboro Deli's lead argument was that it "sells an extensive array of SNAP eligible foods [sic] items that is too long to list." A.R. 67. It was asserted that customers will often buy their meats and other grocery items at Greensboro Deli in large quantities. *Id*. Furthermore, "many" customers were asserted to use Greensboro Deli as their "main source of groceries" in part because of "the large variety of SNAP eligible items it offers," "convenience," "their options in the surrounding area are limited," and "transportation can often be an issue." A.R. 67-68. It was also asserted that

5

there are "an abundance of large families" in the store's market area. A.R. 68

**V.     Analysis of reply, determination of trafficking and review of determination.**

FNS closely reviewed the arguments made by Greensboro Deli. A.R. 106-113. The reviewer noted several arguments at odds with the evidence.

It was noted that SNAP customers do not have to make a purchase to determine the amount of SNAP benefits on their EBT card – that can be done by swiping the EBT card and doing a balance inquiry. A.R. 107. The reviewer pointed out that purchases by non-SNAP customers do not compare with those of SNAP customers due to the non-SNAP eligible items that may have been purchased (like alcohol, tobacco, and non-food items). Furthermore, the submitted credit card slips for non-SNAP purchases reflect dollar amounts smaller than the contested SNAP transactions. A.R. 108.

With respect to large purchase transactions, the reviewer noted that the items Greensboro Deli claimed to sell in bulk were not in the store priced for consumption during the FNS contractor visit. A.R. 106. "The FNS contractor interviewed Sunil Patel who indicated there were no seafood or meat package deals, as can be seen in the store visit form." A.R. 109. While Greensboro Deli submitted pictures of various frozen food items (breaded chicken, frozen thin steaks, onion rings, macaroni and cheese bites), those items are on the menu for non-SNAP eligible hot prepared food items. A.R. 109. The FNS reviewer also pointed to additional data showing that the same households that purchased SNAP items at Greensboro Deli also purchased items at a Save A Lot Supermarket only .13 miles away from the Deli, sometimes making those purchases within hours – and sometimes less than an hour. A.R. 109-110. The data also showed that, in addition to a Walmart located 8.1 miles away, there were two other stores accepting SNAP benefits within half a mile of Greensboro Deli: Family Dollar #8188 and Bodie's Dairy Markets. A.R. 111.

Based on this data and analysis, FNS found that the violations cited in the original charge letter had occurred. Greensboro Deli requested Administrative Review of the determination and resubmitted the materials from its response to the charge letter, along with a one-page affidavit from its owners. A.R. 118-119; 120-163.

After independently reviewing the record materials, *see* A.R. 168-169, an Administrative Review Officer issued the Final Agency Decision that Greensboro Deli committed violations of SNAP and that sufficient evidence existed to support a finding that permanent disqualification as a SNAP authorized retailer was appropriate. A.R. 171-179.

**STATEMENT OF RELEVANT LAW**

**I.      Statutory and regulatory scheme.**

This action is governed by the Food Stamp Act, 7 U.S.C. § 2011, *et seq.*, and its implementing regulations at 7 C.F.R. § 271, *et seq.* SNAP enables participants "to purchase food from retail food stores which have been approved for participation in the supplemental nutrition assistance program." 7 U.S.C. § 2013(a). In lieu of distributing physical coupons, i.e. food stamps, the USDA through the states now prefers to issue EBT cards to program participants. *See* 7 U.S.C. §§ 2012(h)(1), 2016(j)(1)(A). Participants use SNAP credits on the EBT cards to purchase eligible products from participating stores. *See* 7 U.S.C. §§ 2016(a), (b), (h)(11)(A)(iii) & (iv).

Pursuant to the rules and regulations of SNAP, retail food store owners may not accept SNAP credits as payment for ineligible items, which are generally non-food items and some prepared hot food items. *See* 7 C.F.R. § 271.2 ("*Eligible foods* means: (1) Any food or food product intended for human consumption except alcoholic beverages, tobacco, and hot foods and hot food products prepared for immediate consumption . . . ."). The regulations prohibit retailers from provided cash or other consideration for SNAP credits, i.e. "trafficking." 7 U.S.C.

7

§ 2021(b)(3)(B); 7 C.F.R. § 278.6(e); 7 C.F.R. § 271.2. "*Trafficking* means the buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits . . .for cash or consideration other than eligible food . . . ." 7 C.F.R. § 271.2; *see also* 7 C.F.R. § 278.6(e)(1). The penalty for trafficking is permanent disqualification from the program, unless the USDA determines, by "substantial evidence," that the retailer had "an effective policy and program in effect to prevent violations." 7 U.S.C. § 2021(b)(3)(B).

Regulations promulgated under the Food Stamp Act set forth the procedures the FNS should follow when a participating retailer allegedly commits a violation. *See* 7 C.F.R. § 278.6. FNS initially sends an administrative charge letter specifying the violations that provide the basis for disqualification. *See* 7 C.F.R. § 278.6(b). The retailer may respond to the charges orally or in writing within 10 days of receiving the administrative charge letter. *Id.* FNS then reviews the evidence, determines whether a violation has occurred, and issues a final determination. 7 C.F.R. § 278.6(c). Within 10 days of receiving the final determination, the retailer may appeal to the Administrative Review Division ("ARD"). *See* 7 C.F.R. § 279.2. The ARD will base its determination on the FNS record, information submitted by the retailer, and any other relevant information, and then issue a final agency decision. 7 C.F.R. §§ 279.5(a) & 279.5(e).

## II. Scope of judicial review.

The Food Stamp Act provides for *de novo* judicial review of final agency actions in United States District Court to "determine the validity of the questioned administrative action." 7 U.S.C. § 2023(a)(15). The statute accords the administrative action "a presumption of validity." *Redmond v. United States*, 507 F.2d 1007, 1012 (5th Cir. 1975). The plaintiff bears the burden of establishing "by a preponderance of evidence that the agency's determination is factually incorrect." *Goodman v. United States*, 518 F.2d 505, 511 (5th Cir. 1975); *2341 East Fayette Street, Inc. v. U.S.*, Civil Case No. JFM-05-974, 2005 WL 2373696, at *1 (D.Md. Sept.

26, 2005); *see also Fells v. United States*, 627 F.3d 1250, 1253 (7th Cir. 2010)(collecting appellate cases for the proposition that "a store owner who seeks to set aside an agency action bears the burden of proof" with respect to a trial *de novo* under 7 U.S.C. § 2023). The plaintiff may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency. *Redmond*, 507 F.2d at 1012. Absent a showing by the plaintiff that meets the burden of persuasion, the district court must uphold the agency finding as valid. *Goodman*, 518 F.2d at 511. If the Court concludes that a violation occurred, it should apply the "arbitrary and capricious" standard in determining whether the sanction imposed is valid. *Cross v. United States*, 512 F.2d 1212, 1218 (4th Cir. 1975) (en banc)("To be 'valid,' a sanction must not be arbitrary and capricious, and a sanction is arbitrary and capricious if it is unwarranted in law or without justification in fact.").

The provision of *de novo* review "does not, however, entitle plaintiffs to reach a trial on the merits of their cause of action." *Bon Supermarket v. United States*, 87 F. Supp. 2d 593, 598 (E.D. Va. 2000). Rather, "Congress intended nothing more than that the district court would not be bound by the administrative record." *Redmond*, 507 F.2d at 1011; *Bon Supermarket*, 87 F.Supp. 2d at 598. Accordingly, "it is clear that summary judgment is a proper means of disposing of a request for review under 7 U.S.C. § 2023(a)(13), where there are presented no genuine issues of material fact." *Bon Supermarket*, 87 F. Supp. 2d at 599.

### III.     Motion to dismiss for failure to state a claim.

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Although the complaint need only set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), this standard "still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). In considering a motion to dismiss, the court need not accept legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979) ("Their conclusory allegations of discrimination were not supported by any reference to particular acts, practices, or policies of the Fire Department. "). A court may dismiss a complaint "as a matter of law if it lacks a cognizable legal theory or if it alleges insufficient facts under a cognizable legal theory." *Turner v. Kight*, 192 F. Supp. 2d 391, 398 (D. Md. 2002).

**IV.     Motion for summary judgment.**

If, on a motion under Rule 12(b)(6), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. Fed.R.Civ.P. 12(d). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party bears the initial burden of proving that there is no genuine issue as to any material fact. *Celotex*, 477 U.S. at 323. In determining whether the moving party has satisfied that burden, the Court must draw all justifiable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation and citation omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could

reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

**ARGUMENT**

The August 2013 store visit report and the October through December 2013 EBT data are more than sufficient to conclude that Greensboro Deli engaged in trafficking SNAP benefits. The unsupported assertions made by Greensboro Deli's owners and counsel to FNS do not and cannot change the fact that as of August 2013 Greensboro Deli had a limited inventory of relatively low-priced, SNAP-eligible, drinks, snacks, and staples. By contrast, Greensboro Deli had a wide variety of SNAP-ineligible items, including alcohol, tobacco, and hot food items. Furthermore, Greensboro Deli had at least one competitor with a larger and more diverse stock of SNAP items located less than two tenths of a mile away. Given these facts, the large number of high-value and repetitive SNAP transactions at Greensboro Deli are indicative of multiple instances of trafficking. One instance of trafficking is sufficient cause for disqualification. *Mahmood v. United States*, Civ. No. WMN-12-228, 2012 WL 3038638, at *3 (D.Md. July 24, 2012). Accordingly, Greensboro Deli was properly disqualified as a SNAP retailer.

**I.     Undisputed evidence shows that Greensboro Deli violated the Food Stamp Act by trafficking in benefits.**

Although the Complaint contains a cursory allegation that "Plaintiffs disagreed with the facts alleged upon which the decision was based," ECF No. 2 at ¶ 6, Greensboro Deli has not and cannot dispute the accuracy of the SNAP EBT data upon which FNS based its determination of trafficking. A.R. 56-60; A.R. 109-11. The SNAP regulations specifically permit the disqualification of a retail food store on the basis of evidence including on-site investigations and electronic benefit transfer system reports. *See* 7 C.F.R. § 278.6(a); *AJS Petroleum, Inc. v. United States*, Civ. No. L-11-1085, 2012 WL 683538, at *1 (D.Md. Mar. 1, 2012). Here, the FNS charge letter concluded that the EBT transaction data established "clear and repetitive patterns of

unusual, irregular, and inexplicable activity" for a store like Greensboro Deli. A.R. 53.

As found by FNS, the record data provide substantial evidence of transactions "that are consistent with trafficking violations in SNAP benefits." A.R. 179. This Court has previously determined that an administrative record can contain sufficient evidence to warrant disqualification from SNAP. *AJS Petroleum*, 2012 WL 683538, at *5 (citing cases); *Rodriguez Grocery & Deli v. United States Dept. of Agriculture Food and Nutrition Serv.*, Civ. No. WDQ-10-1794, 2011 WL 1838290, at *3 (D.Md. May 12, 2011)("Trafficking may be shown by irregular patterns in a store's EBT data, even if some irregularities can be explained by legitimate customer behaviors."). In *AJS Petroleum*, a case with similar facts to this one, "post hoc rationalizations" for "irregular SNAP transactions" were rejected as means for opposing summary judgment. *Id*. at *5-6. This Court should reach the same result.

Greensboro Deli's explanations of the undisputable EBT data—including its purportedly diverse stock and the lack of local alternatives—are unconvincing in light of the photographic evidence showing the store's limited inventory and the FNS information showing a nearby supermarket, convenience store, and Walmart that accepted SNAP benefits. While Greensboro Deli has argued that it offered cases of frozen foods that might account for large purchases, A.R. 67, the store visit report indicates that such bulk foods were not offered for sale in August 2013. A.R. 11, *see also* A.R. 106, 174, and 176 (reviewing notes from the store visit). Furthermore, as pointed out by FNS, the owners submitted no purchase receipts, order slips, or inventory records to show that those frozen foods were purchased and sold in bulk, A.R. 175, and there is no visible signage in the August 2013 pictures that indicate those bulk foods were available for sale. *See* A.R. 17-46 (pictures from store visit); *see Fells*, 627 F.3d at 1251 (store owner failed to produce inventory receipts to support explanation regarding high-priced meat sales). And while

12

Greensboro Deli argues that its customers have limited transportation means, the evidence shows that the same customers who made large SNAP purchases also patronized Greensboro Save A Lot (less than 700 feet away), WalMart, and Food Lion—often within hours or minutes of leaving the Greensboro Deli. A.R. 109-110. Greensboro Deli's "generalized, hypothetical explanations about its sales and business operations during the investigation period" should be rejected here as similar arguments have been in similar cases. *AJS Petroleum*, 2010 WL 683538, at *6. This Court should find that Greensboro Deli has not explained away all of evidence indicating that trafficking occurred and that FNS was correct to conclude that trafficked in SNAP benefits—even a single instance of trafficking is prohibited.

## II. Disqualification was the appropriate penalty.

Trafficking is a strict liability offense. *Traficanti v. United States*, 227 F.3d 170, 174-175 (4th Cir. 2000). Strict liability makes sense given that store owners—often in distant, rural locations—are in the best position to ensure compliance with SNAP requirements. *See id.* In particular, "Congress chose such a strict liability regime in order to ensure that the person in the best position to prevent fraud—the owner—had sufficient incentive to stop wayward employees from stealing from the government." *Id.*

After a finding of trafficking, the only alternative to disqualification is a civil money penalty, and then only if the firm demonstrates eligibility by showing that an effective compliance program was in place prior to the violations. *See* 7 C.F.R. § 278.6(i). FNS explicitly notified Greensboro Deli of the alternative penalty in its charge letter. A.R. 53. Greensboro Deli did not prove up the criteria that would permit a civil monetary penalty to be levied, *see* A.R. 69, but instead it sought to challenge the underlying charge of trafficking. *See Mahmood*, 2012 WL 3038638, at *3 n.5 (upholding disqualification and observing that Plaintiff was offered the opportunity that anti-trafficking policy was in place prior to violations but failed to do so).

Accordingly, FNS determined that Greensboro Deli "failed to submit sufficient evidence to demonstrate that [it] had established and implemented an effective compliance policy." A.R. 114.

In short, given Greensboro Deli's failure to argue for an alternative, FNS was not only justified but required to disqualify Greensboro Deli as a SNAP retailer once it reached the determination that trafficking had occurred.

## III. Conclusion.

Because the Food and Nutrition Service's finding of trafficking is supported by a preponderance of undisputed evidence, and because disqualification was the appropriate penalty for that violation, this Court should dismiss the complaint or grant summary judgment to the United States.

    Respectfully submitted,

    Rod J. Rosenstein
    United States Attorney

By: \_\_\_\_\_/s/_____
    Joseph R. Baldwin
    Assistant United States Attorney
    Bar No. 29290
    United States Attorney's Office
    36 South Charles Street
    Fourth Floor
    Baltimore, MD 21201
    (410) 209-4800
    joseph.baldwin@usdoj.gov